Opinion issued July 1, 2010.












     





In The
Court of Appeals
For The
First District of Texas




NO. 01-09-00771-CV




IN RE ART HARRIS, Relator





Original Proceeding on Petition for Writ of Mandamus




OPINION ON REHEARING

          On April 22, 2010, a panel of this Court conditionally granted relator Art
Harris’s petition for writ of mandamus. Real party in interest Virgie Arthur filed a
motion for rehearing on May 5, 2010. We deny Arthur’s motion for rehearing, but
we withdraw our April 22, 2010 opinion and issue this opinion in its place.
          This is a petition for writ of mandamus filed by relator, Art Harris, requesting
that we direct the trial court to withdraw discovery orders against Art Harris issued
on January 27, 2009, May 11, 2009, and August 28, 2009.


 In five issues, Harris
argues that the trial court abused its discretion: (1) in ordering Harris to turn over
“electronic media” for forensic examination when there was neither a pending request
for production nor any request for production of documents with which he had not
complied; (2) in ordering Harris to respond to the Special Master’s questions and to
assess usage and contents of other electronic media listed in the Special Master’s
August 17, 2009 email; (3) in refusing to apply Texas Rule of Civil Procedure 193.3
and other discovery procedures on the treatment of privileged documents and creation
of privilege logs; (4) by failing to consider Rule 171 in appointing a special master
to conduct forensic computer examinations; (5) by appointing a special master to
investigate and inquire into patterns of discovery abuse, or, in the alternative, by
failing to remove a special master who is acting outside the limitations and
specifications stated in the order appointing him, including reading attorney-client
communications.
 
Background
          On April 28, 2008, Virgie Arthur filed the underlying proceeding against
Howard K. Stern, Bonnie Stern, Lyndal Harrington, Art Harris, Nelda Turner, Teresa
Stephens, Larry Birkhead, Harvey Levin, and TMZ Productions, Inc., alleging that
certain syndicated television broadcasts and internet publications defamed her and
harmed her efforts to seek custody and visitation of her granddaughter, who is the
child of Vickie Lynn Marshall, also known as Anna Nicole Smith. Art Harris is a
correspondent for Entertainment Tonight, and Arthur alleges in her petition that he
participated in defaming Arthur through internet postings, news articles, and an
interview with a relative of Vickie Lynn Marshall’s that was broadcast on
Entertainment Tonight and that Harris conspired with Howard K. Stern, Marshall’s
former lawyer and companion, and others to defame Arthur.
          On August 1, 2008, Arthur served Art Harris with her First Request for
Production. The requests for production instructed Harris to “[p]roduce documents
and tangible things in the forms as they are kept in the ordinary course of business”
and to “[p]roduce electronically stored information in native format.” The
instructions in the request for production further stated that, for any electronically
stored information, Harris should:           [P]roduce a discovery log that details the type of information, the
source of information, the discovery request to which the information
corresponds, and the information’s electronic ID number.
 
          [W]rite all of the electronically stored information to reasonably
usable storage media, such as CD, DVD, or flash drive.
 
          [I]dentify every source containing potentially responsive
information that [Harris] is not searching for production [and,] [f]or any
materials that [Harris] claims no longer exist or cannot be located,
provide all of the following:
 
          (1) A statement identifying the material.
 
          (2) A statement of how and when the material passed out of
existence of when it could no longer be located.
 
          (3) The reasons for the material’s nonexistence or loss.
 
          (4) The identity, address, and job title of each person having
knowledge about the nonexistence or loss of the material.
 
          (5) The identity of any other materials evidencing the
nonexistence or loss of the material or any facts about the nonexistence
or loss.
 
          Arthur’s request for production number one requested that Harris “produce
copies of all communications, including but not limited to email and other electronic
communications, for the period September 2006 to present,” between Harris and 38
listed email addresses. Arthur’s request for production number two requested that
Harris “[p]roduce all documentation of the identity and/or contact information” for
the thirty-eight email addresses listed in request number one, including “website
registration information, names, physical addresses, telephone numbers, email
addresses, and IP addresses.”
          Request for production number three requested that Harris “[p]roduce copies
of all communications, including but not limited to email and other electronic
communications, for the period September 2006 to the present, between you and the
following or about the following.” The request then listed thirty-nine individuals or
entities related to Arthur’s claims against Harris and the other defendants in the case,
including several parties’ attorneys.
          At this time Harris, Bonnie Stern, Lyndal Harrington, and Nelda “Rose” Turner
were all represented by attorney William Ogden. On August 28, 2008, Harris served
Arthur with his objections and responses to Arthur’s document requests. Harris
objected to the requested discovery based on a qualified privilege due to his status as
a professional journalist, arguing that “[t]he qualified journalist privilege . . . arises
as a matter of common law and constitutional law.” Harris “invoke[d] the privilege
and request[ed] a protective order against the production of material obtained in
newsgathering.” Harris also objected to the requests as “unreasonably overbroad,
prohibitively expensive, and unduly burdensome” under Texas Rule of Civil
Procedure 192.4(a) and argued that “the burden and expense of the proposed
discovery outweighs its likely benefit, taking into account the needs of the case, the
party’s resources and the issues at stake in the litigation,” citing Texas Rule of Civil
Procedure 192.4(b). Finally, he objected that the requests constituted “an
unreasonable and unwarranted invasion of personal privacy.” 
          On October 12, 2008, Arthur filed a motion to compel, arguing that Harris and
the other defendants represented by Ogden had failed to produce relevant documents. 
Ogden responded on behalf of all four defendants, and a hearing was held on
November 21, 2008. On December 4, 2008, Harris produced more than 300 pages
of documents.



          On December 8, 2008, Arthur filed her Second Motion to Compel Responses
to Requests for Production from Defendant Bonnie Stern. The motion stated that
Arthur had served Bonnie Stern with requests for production but had not received any
responsive documents from her, and it requested that the trial court compel Bonnie
Stern to produce the requested documents and order her to “make her computer hard
drive available to [Arthur] for forensic examination and capture of information.”
          On December 11, 2008, the trial court held another hearing on the discovery
disputes. Arthur’s counsel represented that Arthur had motions on discovery disputes
pending for Bonnie Stern, Art Harris, Lyndal Harrington, and Rose Turner. Ogden
appeared as counsel for Harris, Bonnie Stern, Lyndal Harrington, and Rose Turner. 
Arthur’s counsel requested production of Bonnie Stern’s hard drive at the hearing,
arguing spoliation of the evidence based on some emails that were produced from
another source. The following exchange occurred:
[Trial Court]:         Okay. So your request for production does not
include her [Bonnie Stern’s] hard drive but that’s
what you’re asking for right now. Is that right?
 
[Arthur]:                Yes, Your Honor.
 
[Ogden]:                We have never been served with the request,
discovery request to produce her hard drive which
we would oppose.
. . . .
 
[Trial Court]:         [P]rocedurally it seems to me a little off track for— 
 
[Arthur]:                Your Honor, it’s not exactly true that we haven’t
ever requested access to the hard drive. We
contacted Mr. Ogden and the other defendants
earlier in the litigation and suggested to them that
the way to go, given the experts I’ve talked to, is to
have the Court—apply to the Court for the
appointment of an independent computer forensic
examiner, a master. Under the rules that can be done
and that person, the neutral, can examine the hard
drive that needs to be examined. . . .
. . . .
 
[Trial Court]:         Okay. Since we all actually know what he wants, do
we really care if he files a formal request or do we
just decide to rule on the request and save a hearing?
 
[Ogden]:                I do care because I don’t think it’s appropriate for
anyone to go— 
. . . .
 
[Trial Court]:         I understand that you object to producing the hard
drive and to having somebody fish through it.
 
[Ogden]:                Correct.
 
[Trial Court]:         But do you object to having the Court rule one way
or the other on it today even though there’s no actual
written request for production for that?
 
[Ogden]:                I do respectfully because I’d like the opportunity to
brief that and file a response.
 
After discussing the relationship between Arthur’s claims against Bonnie Stern and
her brother, Howard K. Stern, Arthur’s counsel stated that he would “file a motion
this afternoon for an independent forensic examiner.”


 The trial court asked if the
request was “[f]or both computers or just Bonnie’s?” Arthur’s counsel responded:
          I think the—it would probably be best to proceed step by step;
that is, to see if the Court would approve for Bonnie the appointment of
the forensic computer examiner. If we need to utilize his or her services
more down the road, then the order could be amended to do that.
          I suspect we will have to because Teresa Stephens, who was very
much involved in this conspiracy . . . has written the Court and has
informed this counsel that all of her e-mails were on a[n] external server
and they all disappeared while her computer was locked up in a back
vault. That’s not to suggest that our discovery dispute with Rose Turner
is over because we would at some point probably want to approach the
Court and say that she has a lot more that we’ve requested other than the
emails that she’s produced that she should produce.
 
Ogden left the hearing to call Bonnie Stern in order to consult with her regarding
production of her hard drive to a forensic examiner. On returning to the hearing,
Ogden stated that Bonnie Stern agreed to produce her hard drive to a forensic
examiner to “look for and copy any emails or exchanges between the 40 web
addresses and email addresses that are listed in the request for production,” provided
that her bookkeeping business records would not be interfered with. The trial court
stated that she could limit the order so that her unrelated business would not be
examined, and Ogden replied, “That sounds perfect.”
          The parties then discussed whether Ogden’s other clients, including Harris,
would submit to forensic examination of their computers. Ogden stated on the record
that he was not able to reach them, and the following exchange occurred:
[Trial Court]:         All right. Well, we’ll go back then to the notion that
I’m granting the motion to compel as to one and
three with regard to each of those and you all can
either do it the unagreed way or the more or less
agreed way after you get out of here.
 
[Ogden]:                I’m not sure what the unagreed way is but I will—
 
[Trial Court]:         The unagreed way is she just has to turn it over—or
they, whoever they are, just have to turn it over.
 
[Ogden]:                They—they have—they’ve done that to the extent
they can.
 
[Trial Court]:         No, I’m ordering the whole thing, not just what you
chose to produce.
 
[Ogden]:                When you say “turn it over,” you mean hand
[Arthur’s counsel] their computer—
 
[Trial Court]:         No. . . . I mean that as to Request for Productions
[sic] 1 and 3, it’s granted. Produce.
 
[Ogden]:                So they can—they can print those off and deliver the
printed copies?
 
[Trial Court]:         Right. . . . Or you can agree after you get out of here
and get a chance to talk to them for what we are
doing with Ms. Bonnie Stern’s computer.
 
The trial court then informed the parties that it was their responsibility to select an
examiner.
          Over the following weeks, Ogden and Arthur’s counsel communicated
regarding the selection of the forensic examiner. Ogden suggested Craig Ball, along
with several other candidates, and the parties eventually selected Craig Ball. On
December 17, 2008, Arthur’s counsel stated in an email that he had been informed
that Turner and Harrington also desired to have their computers examined by Craig
Ball, and he asked “What is Art Harris’s position?” Ogden’s co-counsel responded
that Harris had opted to produce non-privileged documents rather than agree to the
independent forensic examination.
          On January 2, 2009, Ogden and his firm filed an unopposed motion to
withdraw as attorney for all four defendants, including Harris. On January 5, 2009,
Ogden confirmed in an email that Ball was acceptable as a candidate for independent
forensic examiner and stated generally in a letter that “Defendants agree to using
Craig Ball as the independent forensic examiner. You may file this agreement with
the Court pursuant to [Texas Rule of Civil Procedure] 11.” On January 20, 2009,
Arthur’s counsel filed the letter from Ogden in the trial court as a Rule 11 agreement.
          On January 21, 2009, the trial court granted Ogden’s motion to withdraw as
counsel.
          On January 27, 2009, the trial court entered an “Order Compelling Production
and Appointing Independent Computer Forensic Examiner,” which ordered Harris to
“produce the documents requested by [Arthur] in her Requests for Production Nos.
1 and 3 for the period of September 20, 2006 through March 14, 2008” and appointed
Craig Ball as a “Special Master under the terms and conditions of the Consulting
Agreement attached to this Order . . . to conduct an independent forensic examination
of the relevant computer hard drives [including Harris’s], external hard drives, jump
drives, and other such repositories of electronic communications in the possession or
control of . . . ART HARRIS . . . for the purpose of locating documents responsive
to Plaintiff’s Request for Production.”



 
Attached to this January 27, 2009 order was a consulting agreement, effective
December 18, 2008, between Arthur’s counsel’s firm and Craig Ball. It identified the
firm as “the Client” and stated that the client “desires to engage Ball as a court-appointed neutral computer forensics examiner in Cause No. 2008-24181 in the 280th
Judicial District Court of Harris County, Texas on the terms and conditions set forth
herein.” It further specifies that 
Ball is an independent contractor who will serve as the duly-appointed
neutral agent of the Court and is not an employee or agent of Client. 
Ball does not serve as legal counsel to those Client serves. . . . The
obligation to compensate and reimburse Ball timely and fully under this
Agreement is not contingent upon the outcome of any claim or action,
upon collection of monies from third parties or upon the opinions of
testimony that Ball may offer.
 
          On February 2, 2009, Harris’s new counsel filed a notice of appearance. On
February 3, 2009, Harris filed a motion to clarify the January 27, 2009 order
compelling production and appointing the independent computer forensic examiner. 
A hearing was originally set for February 6, 2009, but was continued until May 8,
2009. At this hearing, Harris’s new counsel argued that the trial court had improperly
included Harris in the order requiring him to produce his computer and storage
devices because Harris had not agreed to surrender his computer. The trial court
responded, “It doesn’t have to be an agreement. It wasn’t an agreement. It was the
Court’s order and I think I said, All right. We’re going to have this stuff from all of
these people and I think they were all the subject of the hearing and I’m not quite sure
what makes you think they weren’t.” Harris’s counsel also addressed the case In re
Weekley Homes,


 which was then pending before the Texas Supreme Court, and
argued that there were no requests for production of documents that they had not
complied with.
          On May 11, 2009, the trial court entered an order denying Harris’s motion to
clarify. The trial court ordered Harris to “produce the relevant computer hard drives,
external hard drives and jump drives (“electronic media”) to Special Master Craig
Ball in accordance with the Order dated January 27, 2009 and the Consulting
Agreement attached thereto, except as where other procedures are specified herein.” 
The trial court ordered Harris 
to contact the Special Master and to deliver the electronic media to him
on or before May 19, 2009 at noon, under the terms specified by the
Special Master. Immediately upon completion of producing a
forensically sound image of the hard drive or other electronic media, as
defined in this order, Special Master Ball shall return the original
electronic media and computer, if applicable, to Defendant Art Harris. 
The Special Master shall promptly capture and produce to Defendant
Harris a copy of all documents as set out in the order of January 27,
2009.
 
This order gave Harris fourteen days from the date he received the captured
documents to produce a privilege log to the Special Master “listing all documents
submitted by Special Master Ball to Defendant Art Harris, which Defendant Art
Harris is withholding from Plaintiff and the reasons for withholding the documents
from production,” and it ordered that Ball “produce all documents not listed on the
privilege log to [Arthur]” and “maintain for the remainder of this lawsuit the
electronic media and documents listed on the privilege log.” The trial court ordered
that Arthur pay the costs of the Special Master. Harris then turned over electronic
media to the special master, including a Dell desktop computer with an 80 GB hard
drive, a Dell laptop computer with a 160 GB hard drive, and an external 200 GB hard
drive.
          The special master sent emails to Harris’s counsel on August 7 and August 11
raising questions regarding Harris’s replacement of his hard drive


 and requesting that
Harris give him more information and produce more electronic devices. The special
master also sent other defendants emails regarding Harris’s electronic media that were
eventually posted on Nelda Turner’s blog.
          On August 14, 2009, Harris’s counsel responded by letter to the emails
requesting more information and answering the special master’s questions regarding
the alleged replacement of the hard drive. The special master was not satisfied with
this explanation and again requested more information and production of more
electronic media from Harris in a series of emails from August 17, 2009 to August 23,
2009.
          On August 23, 2009, Harris filed a motion to reconsider the appointment of the
special master and request for protective order and stay of appointment, arguing that 
the appointment of Craig Ball as a special master was made in violation of the
requirements of Texas Rule of Civil Procedure 171, that Harris was not properly a
subject of the order compelling production of his hard drive to Ball, and that Ball
acted outside the role of special master. Harris maintained that he had already
produced more than three million pages of emails and that the trial court should “stay
and terminate the role of the Special Master immediately.” Harris also argued that
Ball “has made sarcastic, editorial, and prejudicial comments about [Harris] regarding
his date and his style of writing, as well as disclosing information gleaned from
emails, some of which we believe were attorney-client communications.”
          The trial court held a hearing, and, on August 28, 2009, it signed an order
denying Harris’s motion to reconsider. The trial court ordered that Harris “shall
within 14 days of this Order respond to Special Master Craig Ball’s August 17, 2009
email inquiry and evaluate whether the electronic media mentioned in the email
contains communications from the relevant time period.” The trial court also ordered
that Harris “shall not produce the electronic media referred to in Special Master Craig
Ball’s August 17, 2009 email at this time” but that “nothing shall be deleted or
destroyed from Defendant Art Harris’s electronic media referred to in Special Master
Craig Ball’s August 17, 2009 email inquiry.” Finally, the trial court ordered that
Harris “has until September 28, 2009, to produce a privilege log pertaining to the CD
provided to [Harris’s] counsel by Special Master Craig Ball on August 28, 2009, and
submit it along with the captured documents to the Court for in-camera inspection.”
          Harris filed this petition for writ of mandamus on September 4, 2009. We
granted his motion for emergency temporary relief suspending the trial court’s
enforcement of the three disputed orders.
Standard of Review
          Mandamus relief is appropriate only if a trial court abuses its discretion and no
adequate appellate remedy exists. In re CSX Corp., 124 S.W.3d 149, 151 (Tex.
2003). The heavy burden of establishing an abuse of discretion and an inadequate
appellate remedy is on the party resisting discovery. Id. A trial court commits a clear
abuse of discretion when its action is “so arbitrary and unreasonable as to amount to
a clear and prejudicial error of law.” Id. (citing CSR Ltd. v. Link, 925 S.W.2d 591,
596 (Tex. 1996) (orig. proceeding)).
Orders Compelling Discovery
          In his first issue, Harris argues that the trial court abused its discretion by
ordering him to turn over “electronic media” for forensic examination when there was
neither a pending request for production nor any request for production of documents
with which he had not complied, he had filed a motion for a protective order, and no
motion to compel production was pending against him. In his third issue, he argues
that the trial court erred in refusing to apply Texas Rule of Civil Procedure 193.3 and
other discovery procedures on the treatment of privileged documents and creation of
privilege logs. We address these issues together.
A.      Order to Turn Over Documents Without Pending Request for Production
or Motion to Compel

          Discovery in this case is governed by Texas Rules of Civil Procedure 192.3,
192.4, 193, and 196.4.


 Rule 192.3 allows a party to “obtain discovery regarding any
matter that is not privileged and is relevant to the subject matter of the pending action,
whether it relates to the claim or defense of the party seeking discovery or the claim
or defense of any other party.” Tex. R. Civ. P. 192.3(a). The comments to Rule 192
state, “While the scope of discovery is quite broad, it is nevertheless confined by the
subject matter of the case and reasonable expectations of obtaining information that
will aid resolution of the dispute.” Tex. R. Civ. P. 192 cmt. 1; see also CSX, 124
S.W.3d at 152 (“Although the scope of discovery is broad, requests must show a
reasonable expectation of obtaining information that will aid the dispute’s
resolution.”).
          Rule 192.4 imposes limitations on the scope of discovery. Tex. R. Civ. P.
192.4. It states:
The discovery methods permitted by these rules should be limited by the
court if it determines, on motion or on its own initiative and on
reasonable notice, that:
 
          (a) the discovery sought is unreasonably cumulative or
duplicative, or is obtainable from some other source that is more
convenient, less burdensome, or less expensive; or
 
          (b) the burden or expense of the proposed discovery outweighs its
likely benefit, taking into account the needs of the case, the amount in
controversy, the parties’ resources, the importance of the issues at stake
in the litigation, and the importance of the proposed discovery in
resolving the issues.
 
Id. Determinations regarding the scope of discovery are largely within the trial
court’s discretion. In re Colonial Pipeline Co., 968 S.W.2d 938, 941 (Tex. 1998)
(citing Dillard Dep’t Stores, Inc. v. Hall, 909 S.W.2d 491, 492 (Tex. 1995) (orig.
proceeding)). However, the discovery rules “explicitly encourage trial courts to limit
discovery when ‘the burden or expense of the proposed discovery outweighs its likely
benefit, taking into account the needs of the case, the amount in controversy, the
parties’ resources, the importance of the issues at stake in the litigation, and the
importance of the proposed discovery in resolving the issues.’” In re Alford
Chevrolet-Geo, 997 S.W.2d 173, 181 (Tex. 1999) (orig. proceeding) (quoting Tex.
R. Civ. P. 192.4(b)). “[A] discovery order that compels overly broad discovery ‘well
outside the bounds of proper discovery’ is an abuse of discretion for which mandamus
is the proper remedy.” Dillard, 909 S.W.2d at 492 (quoting Texaco, Inc. v.
Sanderson, 898 S.W.2d 813, 815 (Tex. 1995) (orig. proceeding)). 
          Rule 193 “imposes a duty upon parties to make a complete response to written
discovery based upon all information reasonably available, subject to objections and
privileges.” Tex. R. Civ. P. 193 cmt. 1. It permits a party to object to discovery as
overbroad and to refuse to comply with it entirely. Id. at cmt. 2 (citing Loftin v.
Martin, 776 S.W.2d 145 (Tex. 1989) (orig. proceeding)). “A central consideration
in determining overbreadth is whether the request could have been more narrowly
tailored to avoid including tenuous information and still obtain the necessary,
pertinent information.” CSX, 124 S.W.3d at 153. “[D]iscovery may not be used as a
fishing expedition or to impose unreasonable discovery expenses on the opposing
party.” Alford Chevrolet-Geo, 997 S.W.2d at 181 (citing K Mart Corp. v. Sanderson,
937 S.W.2d 429, 431 (Tex. 1996) (orig. proceeding) (holding that not only must
discovery requests be reasonably tailored to include only matters relevant to case, but
discovery requests may not be used as fishing expedition or to impose unreasonable
discovery expenses on opposing party)); see also In re Am. Optical Corp., 988
S.W.2d 711, 713 (Tex. 1998) (orig. proceeding).
          Here, Arthur requested all correspondence between Harris and a list of 38 other
email addresses and people, some of whom were business associates and attorneys
for parties to the litigation who were not alleged to have been co-conspirators to
defame Arthur. Arthur’s requests also delved into information potentially protected
by Harris’s privilege as a journalist.
          After Arthur served her discovery requests on him, Harris responded by filing
objections based on privilege as a journalist and scope. Harris objected to the
requests as “unreasonably overbroad, prohibitively expensive, and unduly
burdensome” under Texas Rule of Civil Procedure 192.4(a), and he argued that “the
burden and expense of the proposed discovery outweighs its likely benefit, taking into
account the needs of the case, the party’s resources and the issues at stake in the
litigation,” citing Texas Rule of Civil Procedure 192.4(b). Finally, he objected that
the requests constituted “an unreasonable and unwarranted invasion of personal
privacy.”
          On October 12, 2008, Arthur filed her motion to compel production from
Harris, and, following a hearing on November 21, 2008, Harris produced
approximately 300 pages of emails and other documents that he determined were
responsive to the discovery requests. Arthur made no further motion to compel
discovery from Harris, and she never served Harris with any further discovery
requests. At the December 11, 2008 discovery hearing held on Arthur’s motion to
compel discovery from Harris’s co-defendant Bonnie Stern, Arthur made only limited
references to Harris, and the trial court did not address any arguments or objections
raised by Harris. Arthur never established that the scope of discovery requested from
Harris was required for her to establish her claims of defamation and conspiracy. 
Nevertheless, following the hearing on Arthur’s motion to compel production from
Bonnie Stern, the court ordered Harris to turn over his computer hard drive, external
drives, and jump drives to the court-appointed “Special Master” and forensic
examiner, Craig Ball.
          Harris’s February 3, 2009 motion to clarify the January 27 order made it clear
that Harris wished to reassert his previous objections that the discovery ordered by
the trial court was overbroad, prohibitively expensive, and unduly burdensome. The
trial court denied the motion. 
          Because Arthur did not file a motion to compel further discovery from Harris
following the November 21, 2008 hearing, Harris had no opportunity to urge his
objections and motion for a protective order prior to being ordered to produce the
documents sought by Arthur. We hold that in compelling discovery from Harris
without requiring Arthur to identify specific discovery requests with which Harris had
not complied and without having before it a motion to compel discovery from Harris,
the trial court acted arbitrarily and without considering the discovery rules. See Tex.
R. Civ. P. 215.1, 215.2, 215.3; In re Ford Motor Co., 165 S.W.3d 315, 317 (Tex.
2005) (holding that mandamus relief is available when trial court does not follow
guiding rules and principles and reaches arbitrary and unreasonable decision). We
further hold that the trial court abused its discretion in ordering overbroad discovery
and in failing to determine whether the documents sought by Arthur from Harris were
privileged, as Harris claimed, or even whether they were relevant or reasonably
calculated to lead to the discovery of evidence relevant to Arthur’s claims. See Tex.
R. Civ. P. 192.3 (stating that “a party may obtain discovery regarding any matter that
is not privileged and is relevant to the subject matter of the pending action”).
B.      Orders to Produce Electronic Media
          Also in his first issue, Harris argues that the trial court abused its discretion by
ordering him to produce his electronic media for computer forensic examination
because Arthur had made no request for the electronic hardware and no showing that
the benefits of production outweigh the costs as required by Rule 196.4. He cites In
re Weekley Homes to support his argument.



          Rule 196.4 provides:
To obtain discovery of data or information that exists in electronic or
magnetic form, the requesting party must specifically request production
of electronic or magnetic data and specify the form in which the
requesting party wants it produced. The responding party must produce
the electronic or magnetic data that is responsive to the request and is
reasonably available to the responding party in its ordinary course of
business. If the responding party cannot—through reasonable
efforts—retrieve the data or information requested or produce it in the
form requested, the responding party must state an objection complying
with these rules. If the court orders the responding party to comply with
the request, the court must also order that the requesting party pay the
reasonable expenses of any extraordinary steps required to retrieve and
produce the information.
 
Tex. R. Civ. P. 196.4.
          In Weekley Homes, the Texas Supreme Court held that Rule 196.4 requires a
specific request “to ensure that requests for electronic information are clearly
understood and disputes avoided.” 295 S.W.3d at 314. It set out the appropriate
procedure for requesting electronic information under the rules:
When a specific request for electronic information has been lodged,
Rule 196.4 requires the responding party to either produce responsive
electronic information that is “reasonably available to the responding
party in its ordinary course of business,” or object on grounds that the
information cannot through reasonable efforts be retrieved or produced
in the form requested. Once the responding party raises a Rule 196.4
objection, either party may request a hearing at which the responding
party must present evidence to support the objection. Tex. R. Civ. P.
193.4(a). To determine whether requested information is reasonably
available in the ordinary course of business, the trial court may order
discovery, such as requiring the responding party to sample or inspect
the sources potentially containing information identified as not
reasonably available.
 
Id. at 315. If the responding party fails to meet its burden of production, the trial
court may order production subject to the discovery limitations imposed by Texas
Rule of Civil Procedure 192.4. Id.
          The supreme court recognized that “[p]roviding access to information by
ordering examination of a party’s electronic storage device is particularly intrusive
and should be generally discouraged, just as permitting open access to a party’s file
cabinets for general perusal would be.” Id. at 317. It stated:
As a threshold matter, the requesting party must show that the
responding party has somehow defaulted in its obligation to search its
records and produce the requested data. The requesting party should
also show that the responding party’s production “has been inadequate
and that a search of the opponent’s [electronic storage device] could
recover deleted relevant materials.” Courts have been reluctant to rely
on mere skepticism or bare allegations that the responding party has
failed to comply with its discovery duties. Even if the requesting party
makes this threshold showing, courts should not permit the requesting
party itself to access the opponent’s storage device; rather, only a
qualified expert should be afforded such access, and only when there is
some indication that retrieval of the data sought is feasible. Due to the
broad array of electronic information storage methodologies, the
requesting party must become knowledgeable about the characteristics 
of the storage devices sought to be searched in order to demonstrate the
feasibility of electronic retrieval in a particular case. And consistent
with standard prohibitions against “fishing expeditions,” a court may not
give the expert carte blanche authorization to sort through the
responding party’s electronic storage device. Instead, courts are advised
to impose reasonable limits on production. Finally, federal courts have
been more likely to order direct access to a responding party’s electronic
storage devices when there is some direct relationship between the
electronic storage device and the claim itself.
 
Id. at 317–19 (internal citations omitted). Weekley Homes further held that even “[i]f
the responding party meets its burden by demonstrating that retrieval and production
of the requested information would be overly burdensome, the trial court may
nevertheless order targeted production upon a showing by the requesting party that
the benefits of ordering production outweigh the costs.” Id. at 315 (citing Tex. R.
Civ. P. 192.4).
          We first address Arthur’s arguement that Harris waived any complaints arising
under Weekley Homes.
          1. Preservation
          Arthur argues that Harris never made any arguments based on Weekley Homes
before the trial court and, therefore, failed to preserve those complaints under Texas
Rule of Appellate Procedure 33. She notes that Weekley Homes was decided on
August 28, 2009, after the January 27 and the May 11 orders were signed. However,
the transcript of the May 8, 2009 hearing clearly reflects that Harris’s counsel did
bring the Weekley Homes case to the attention of the trial court and that Harris
reasserted similar arguments in his August 23, 2009 motion to reconsider, in which
he argued, among other things, that the trial court had not followed the correct
procedure and that this case was not appropriate to compel production of the actual
hard drives. 
          We conclude that Harris’s actions were sufficient to put the trial court on notice
regarding his complaints as raised in this petition for writ of mandamus, and this issue
was preserved. See Tex. R. App. P. 33.1.
          2. Production of Electronic Discovery
          The trial court’s January 27, 2009 order required Harris to produce “the
relevant computer hard drives, external hard drives, jump drives, and other such
repositories of electronic communications in [his] possession or control” for an
“independent forensic examination.” On February 3, 2009, Harris filed a motion to
clarify this order, arguing that he should not have been included in the order to turn
over hard drives for forensic examination. After a hearing on May 8, 2009, the trial
court denied the motion to clarify. The trial court’s May 11, 2009 order again ordered
Harris to “produce the relevant computer hard drives, external hard drives and jump
drives.” Harris argues that the trial court erred in failing to follow the provisions of
Rule 196.4, as described in Weekley Homes, in compelling him to produce his hard
drives in the January 27 and May 11 orders. We agree.
          Arthur’s original requests for production specifically requested that Harris
produce emails and other electronic communications in their native format.


 See Tex.
R. Civ. P. 196.4. After Harris filed objections, arguing, in part, that the requests were
prohibitively expensive and unduly burdensome, Arthur filed a motion to compel
Harris to comply with the discovery requests. In response, Harris produced 300
documents that were “responsive to the request and [were] reasonably available to the
[him as the] responding party in [his] ordinary course of business.” See id. Arthur
did not file any other motions to compel discovery from Harris, nor did Arthur ever
serve Harris with a discovery request for his hard drives. Thus, Arthur failed to
follow the first step required by Rule 196.4 and Weekley Homes by failing to make
a specific request of the production of the hard drives themselves. See id. (“To obtain
discovery of data or information that exists in electronic or magnetic form, the
requesting party must specifically request production of electronic or magnetic data
and specify the form in which the requesting party wants it produced.”); Weekley
Homes, 295 S.W.3d at 314 (holding that specific request is required “to ensure that
requests for electronic information are clearly understood and disputes avoided”). 
The trial court also failed to follow any of the other provisions of Rule 196.4 as
described in Weekley Homes. Nor, as stated above, did the trial court ever address
Harris’s objections to discovery. In fact, the record of the December 11, 2008 hearing
does not contain any argument by Arthur’s counsel that Harris’s production as of the
date of that hearing had been insufficient. Rather, Bonnie Stern, and not Harris, was
the subject of the December 11 hearing, and, thus, here there is less than the assertion
of “mere skepticism or bare allegations” that Weekley Homes had deemed insufficient
to compel discovery of a hard drive or other electronic storage device. See 295
S.W.3d at 317–18, 320 (holding that “conclusory statements that the deleted emails
it seeks ‘must exist’ and that deleted emails are in some cases recoverable is not
enough to justify the highly intrusive method of discovery the trial court ordered,
which afforded the forensic experts ‘complete access to all data stored on [the
Employees’] computers’”). 
          Following the trial court’s January 27, 2009 order appointing a special master
and forensic examination and requiring Harris to produce his hard drives and jump
drives, Harris filed a motion to clarify the order, arguing that he was improperly
ordered to produce the drives. In response, the trial court held a hearing on May 8,
2009 on Harris’s motion to clarify, but it did not require Arthur to make any showing
that Harris “has somehow defaulted in [his] obligation to search [his] records and
produce the requested data” or that Harris’s production had been “inadequate and that
a search of [his electronic storage devices] could recover deleted relevant materials.” 
See id. at 317. Nor did Arthur offer any evidence supporting her effort to obtain the
hard drives or any evidence regarding which, if any, of Harris’s electronic storage
devices could be expected to contain discoverable documents at the hearing on
Harris’s motion to clarify the January 27 order. See id.
          Weekley Homes also held that direct access to a responding party’s electronic
storage devices is more likely to be appropriate “when there is some direct
relationship between the electronic storage device and the claim itself.” Id. at 317–19
(recognizing that “ordering examination of a party’s electronic storage device is
particularly intrusive and should be generally discouraged, just as permitting open
access to a party’s file cabinets for general perusal would be” and citing cases where
employers sued former employees for misuse of company computers as instances
where close relationship between claims and defendant’s computer equipment
justified production of computers themselves). Arthur made no such showing either
at the December 11, 2008 hearing or at the May 8, 2009 hearing or in any motion to
compel. Moreover, even if we could conclude that the record supported a finding by
the trial court that Harris’s electronic storage devices could be expected to contain
discoverable documents and that direct access to those devices was justified by some
direct relationship between the storage devices and Arthur’s claims, Arthur also failed
to demonstrate that the “particularities of [the] electronic information storage
methodology [would] allow retrieval of emails that have been deleted or overwritten,
and what that retrieval [would] entail.” Id. at 320. In sum, the record does not
contain any evidence sufficient to satisfy the stringent standard for compelling
production of Harris’s electronic storage devices.
          Finally, the trial court failed to consider whether the benefits of production to
Arthur outweighed the burdens of the appointment of a special master and forensics
expert to obtain the information sought when ordering the production of Harris’s
computer hard drive, external drives, and jump drives to the court-appointed Special
Master. See Tex. R. Civ. P. 192.4 (requiring trial courts to weigh benefits of
production against burdens imposed when requested information is not reasonably
available in ordinary course of business). Thus, even if Arthur had shown that the
documents sought from Harris were not privileged, were relevant to her claims
against Harris, and could not have been reasonably obtained other than by ordering
him to turn over his hard drives, and that there was a direct relationship between the
hard drives and Arthur’s claims, which she has not, she still would not be entitled to
discovery of Harris’s hard drives. See id.
          We conclude that the trial court abused its discretion not only by compelling
production of overly broad discovery without addressing Harris’s objections and
without a motion to compel discovery from Harris before it, but also by issuing its
even more invasive order that Harris produce his hard drives and by failing to require
Arthur to make any showing that the benefit of the discovery she sought outweighed
the burden and expense to Harris. Thus, we hold that the trial court abused its
discretion by issuing the January 27, 2009 order compelling Harris to produce
documents in response to Arthur’s requests for production and to produce his hard
drives and by issuing its May 11, 2009 order denying Harris’s motion to clarify. See
Alford Chevrolet-Geo, 997 S.W.2d at 181 (holding that although trial court has broad
discretion to define scope of discovery, it can abuse its discretion by acting
unreasonably). 
          We sustain Harris’s first issue.
C.      Refusal to Apply Rule 193.3 on Treatment of Privileged Documents
          In his third issue, Harris argues that the trial court abused its discretion by
refusing to recognize the discovery procedures of Texas Rule of Civil Procedure
193.3 in the treatment of privileged documents and the creation of privilege logs. 
Rule 193.3 provides, “A party may preserve a privilege from written discovery in
accordance with this subdivision.” Tex. R. Civ. P. 193.3. It further provides that a
party claiming that “material or information responsive to written discovery is
privileged may withhold the privileged material or information from the response”
and must provide a withholding statement describing the discovery being withheld,
and it provides that the requesting party may then request that the “withholding party
identify the information and material withheld.” Id. Because we have already
determined that the trial court erred in the ways set forth above, this issue is moot.
          We overrule Harris’s third issue
Appointment of Special Master
          In his fourth and fifth issues, Harris argues that the trial court abused its
discretion in appointing Craig Ball as a special master to conduct a forensic
examination of Harris’s computers without following Texas Rule of Civil Procedure
171. Arthur responds that Harris consented to the appointment of the special master,
citing a series of emails and other negotiations between the parties that culminated
in the filing of the Rule 11 agreement on January 20, 2009 and the trial court’s order
of January 27, 2009. Arthur also argues that Harris’s objection to the special master
is barred by laches because the special master was appointed on January 27, 2009,
and Harris cooperated with the special master beginning May 14, 2009, but did not
seek mandamus relief until September 4, 2009.
A.      Consent & Laches
          Parties may consent to the appointment of a special master. See Simpson v.
Canales, 806 S.W.2d 802, 811 (Tex. 1991) (orig. proceeding). However, the trial
court’s statements at the May 8, 2009 hearing that “[i]t wasn’t an agreement” and that
the trial court acted on her own authority in appointing Ball as special master defeat
Arthur’s argument that the parties consented to Ball’s appointment as a special
master. Moreover, the January 20, 2009 Rule 11 Agreement between Ogden and
Arthur’s counsel was an agreement to use Craig Ball as “the independent forensic
examiner” as ordered by the trial court. It was not an agreement that a special master
be appointed. And it was both executed and filed after Ogden had withdrawn as
Harris’s counsel.
          Arthur also argues that delay alone is a valid ground for denying Harris’s
request for mandamus relief and that Harris fatally delayed in asserting his objections
to the appointment of a special master. See In re Xeller, 6 S.W.3d 618, 624 (Tex.
App.—Houston [14th Dist.] 1999, orig. proceeding) (“[J]udicial economy would have
been better served if relators’ [sic] had sought mandamus relief immediately after the
appointment of the master.”); Owens-Corning Fiberglass Corp. v. Caldwell, 830
S.W.2d 622, 625 (Tex. App.—Houston [1st Dist.] 1991, orig. proceeding) (holding
that party may object to appointment of master either before participating in any
proceeding before the master, or before parties, master, and trial court have acted in
reliance on appointment).
          The record, however, shows that Harris diligently sought to enforce his rights
by filing a motion to clarify the January 27 order appointing Craig Ball as special
master within days after it was signed by the trial court. That motion was not heard
until May 8. In the hearing, Harris argued that the trial court had improperly included
him in the order requiring him and several other defendants to produce their
computers and electronic storage devises, and he raised the Weekley Homes case. 
Harris thus objected to the appointment of the special master before he complied with
the May 11, 2009 order compelling him to produce three hard drives to the special
master. Therefore, he did make a timely objection. See Caldwell, 830 S.W.2d at
625–26 (holding that party timely objected to appointment of special master and did
not waive its right to object when it objected to appointment several days before it
participated in proceedings before special master). Furthermore, the argument of
delay does not prevent Harris from asserting that the trial court erred in failing to
remove the special master on the grounds that the special master has, since the
production of the original three hard drives, behaved inappropriately and exceeded
the scope of his authority or that he should not be compelled to produce any further
electronic media to the special master.
          We conclude that Harris has not waived his fourth and fifth issues.
B.      Trial Court’s Appointment of Craig Ball
          We now consider the authority of the trial court to compel Harris to submit
matters to a special master. In his fourth issue, Harris argues that this was not an
“exceptional case” and that there was no good cause for appointment of a master, as
required by Rule 171, governing such appointments. Harris further argues that Craig
Ball cannot serve as a neutral special master because he is under contract with, paid
for, and indemnified by Arthur under the consulting agreement attached to the trial
court’s January 27 order. In his fifth issue, Harris argues that the trial court abused
its discretion in appointing the special master to read attorney-client communications
and to investigate and inquire into perceived discovery abuses. In the alternative, he
argues that the trial court erred in failing to remove the special master for acting
outside the limitations and specifications stated in the referral order by placing
himself in an adversarial position, by investigating perceived discovery abuses, by
exhibiting bias and lack of impartiality, and by making highly prejudicial statements. 
          Much of the confusion on this issue stems from the trial court’s conflation of
the roles of a forensic examiner and a special master. Texas Rule of Civil Procedure
171 is the exclusive authority for the appointment of masters in Texas state courts. 
Simpson, 806 S.W.2d at 810. Rule 171 provides, in part:
          The court may, in exceptional cases, for good cause appoint a
master in chancery, who shall be a citizen of this State, and not an
attorney for either party to the action, nor related to either party, who
shall perform all of the duties required of him by the court, and shall be
under orders of the court, and have such power as the master of chancery
has in a court of equity.
 
Tex. R. Civ. P. 171. Rule 171 also provides that “[t]he court shall award reasonable
compensation to such master to be taxed as costs of suit.” Id.; TransAmerican
Natural Gas Corp. v. Mancias, 877 S.W.2d 840, 844 (Tex. App.—Corpus Christi
1994, orig. proceeding). A special master “has and shall exercise the power to
regulate all proceedings in every hearing before him and to do all acts and take all
measures necessary or proper for the efficient performance of his duties” as specified
in the trial court order. Tex. R. Civ. P. 171. 
          “[A]ppointment of a master lies within the sound discretion of the trial court
and should not be reversed except for a clear abuse of that discretion.” Simpson, 806
S.W.2d at 811. However, it is “improper for . . . an order [appointing a special
master] to cast the master in the role of advocate rather than merely referee in the
underlying proceeding.” TransAmerican, 877 S.W.2d at 843 (citing Caldwell, 830
S.W.2d at 626 (noting impropriety of allowing master to require production of
evidence regardless of whether opposing party has requested it)). 
          A forensic examiner in the context of electronic discovery has a much different
role. Although we have found no rule or case that specifically defines “forensic
examiner,” a forensic examiner as contemplated in Weekley Homes is a computer
expert whose sole purpose is to create forensic images of a particular electronic
storage device and then to search the images for specified documents using a
predesignated list of search terms. See Weekley Homes, 295 S.W.3d at 313. A
forensic expert as contemplated by Rule 196.4 and Weekley Homes is not given any
authority to conduct hearings, to make recommendations regarding what evidence
should be produced, or to require the production of any particular storage device or
other item of evidence. In contrast to Rule 171’s provision that the costs of a special
master be taxed as a cost of suit, Rule 196.4 contemplates that “the requesting party
pay the reasonable expenses of any extraordinary steps required to retrieve and
produce the information.” Tex. R. Civ. P. 196.4. In accordance with this rule, the
requesting party in Weekley Homes clearly contemplated paying the expenses of its
forensic experts if it had been permitted access to Weekley Homes’ hard drives. See
Weekley Homes, 295 S.W.3d at 313.
          Here, Arthur sought appointment of Craig Ball as an independent forensic
examiner and entered a Rule 11 agreement with Ogden that Ball be the independent
forensic examiner appointed. The January 27, 2009 order, however, expressly
appointed “Craig Ball of Austin, Texas as a Special Master, under the terms and
conditions contained in the Consulting Agreement attached to this order and
incorporated herein,” an agreement which provided that Ball be hired by Arthur’s
counsel as an independent forensic examiner. Ball’s role in the litigation is in some
ways similar to that of a forensic examiner as contemplated by Rule 196.4 and
Weekley Homes. Ball is paid by Arthur’s counsel, and his role as envisioned in the
trial court’s January 27, 2009 order at least partially conforms to the role of a forensic
expert employed to create images of particular electronic storage devices and then
search for specified documents using a predesignated list of search terms at the
expense of the requesting party. We have already determined, however, that the
discovery order to produce the hard drives was an abuse of discretion. Therefore, the
question of Ball’s ability to serve as a forensic expert to examine the hard drives on
Arthur’s behalf is moot. 
          However, the January 27 order also specifically conferred on Ball a number of
powers extended to a special master not “related to either party” and appointed by the
court “in exceptional cases” under Rule 171. See Tex. R. Civ. P. 171. The trial court
referred to Ball as a special master and, from the time of his appointment, treated him
as more than a forensic expert, allowing him to contact the parties and to make
recommendations regarding the production of particular items. Thus, we next
determine whether the trial court erred in the appointing Ball as a special master.
          Rule 171 permits a trial court to appoint a special master “in exceptional cases,
for good cause.” Tex. R. Civ. P. 171. While the “‘exceptional cases/good cause’
criterion of Rule 171 is not susceptible of precise definition,” the supreme court has
held that “this requirement cannot be met merely by showing that a case is
complicated or time-consuming, or that the court is busy.” Simpson, 806 S.W.2d at
811. However, courts have found sufficient justification for the appointment of a
master to supervise “discovery questions which require extensive examination of
highly technical and complex documents by a person having both a technical and a
legal background.” TransAmerican, 877 S.W.2d at 843 (holding that “the technical
nature of the present case and the potential help which may be provided to the trial
court by a special master with geological training and expertise constitutes a
sufficiently exceptional condition to justify the present appointment”); see also
Hourani v. Katzen, 305 S.W.3d 239, 247–48 (Tex. App.—Houston [1st Dist.] 2009,
pet. denied) (“The highly technical nature of the case, which involves the feasibility
of constructing a driveway or bridge along the edge of a lake without damaging the
lake, and the assistance which may be provided to the trial court by a special master
with engineering training and expertise constitutes a sufficiently exceptional
condition to justify the present appointment.”).
          Here, the case is not of a “highly technical nature.” The fact that production
of some of the discovery sought by Arthur might require expert forensic examination
of electronic media is not sufficient to show that this is an “exceptional case”
requiring expertise in computer forensics. Electronic discovery is a common
component of modern litigation, and its mere presence alone does not constitute a
showing of good cause for appointing a special master. Neither party has argued that
some specialized knowledge would be necessary to interpret any of the documents
produced in this case. 
          Arthur also argues that appointment of a special master was necessary in this
case because of her allegations that Harris did not produce all of the emails and other
electronic documents in his possession that are responsive to her requests for
production. However, Arthur made no showing to the trial court that Harris had
failed to produce requested documents within the proper scope of discovery. As we
have already discussed at length, Arthur did not even file a motion to compel
discovery from Harris objecting to his production of documents before or after the
December 11 hearing and filed no additional requests for production; nor did the trial
court hear or rule on Harris’s objections to Arthur’s requests. Furthermore, were
Arthur to show that this was an exceptional case and that examination of Harris’s
hard drives was necessary for her to prove her case and not unduly burdensome to
Harris, a forensic examination could be performed by a forensic examiner without the
power and authority of a special master.
          We conclude that the record reflects that this case does not meet the
“exceptional case/good cause criterion of Rule 171.” Therefore, we hold that the trial
court abused its discretion in appointing Ball as a special master. See Simpson, 806
S.W.2d at 811. To the extent that the trial court’s appointment of Ball was as a
forensic examiner instead of as a master, we hold that the trial court abused its
discretion by failing to comply with Weekley Homes, as we have explained above.
          We sustain Harris’s fourth and fifth issues.
          In his second issue, Harris argues that the trial court abused its discretion in
issuing the August 28 order compelling him to respond to the special master’s August
17, 2009 email. Because we have already determined that the court’s appointment
of Craig Ball as a forensic examiner and special master was an abuse of discretion,
this issue is moot.
          We overrule Harris’s second issue.
 
 
 
Conclusion
          We conditionally grant the petition for writ of mandamus and direct the trial
court to withdraw its discovery orders against Art Harris issued on January 27, 2009,
May 11, 2009, and August 28, 2009. Any pending motions are dismissed as moot.



 

                                                             Evelyn V. Keyes
                                                             Justice
 
Panel consists of Justices Keyes, Alcala, and Hanks.